621 A.2d 872

Carol BELCHER

v.

T. ROWE PRICE FOUNDATION, INC. et al.

No. 78, Sept. Term, 1992.

Court of Appeals of Maryland.

March 25, 1993.

710

Jeff E. Messing, Baltimore, on brief, for appellant.

Alan M. Carlo (Mason, Ketterman & Morgan, on brief), Baltimore, for appellee.

Rudolph L. Rose (Stan M. Haynes, Semmes, Bowen & Semmes of Baltimore, on brief), amicus curiae for American Ins. Ass'n, Bethlehem Steel Corp., Certainteed Corp., The Injured Workers' Ins. Fund, and The National Council on Compensation Ins.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, and CHARLES E. ORTH, Jr., (Retired, Specially Assigned) JJ.

ORTH, Judge.

## I

On this appeal we visit once again the Workers' Compensation Act, now codified as Title 9 in the Labor and Employment article of the Maryland Code (1991).[1] We are called upon to determine the expanse of the phrase "accidental personal injury" in the contemplation of the Act. The phrase appears first in § 9–101 under the subtitle "Definitions." Subsection (b) provides in relevant part:

"Accidental personal injury" means:
(1) an accidental injury that arises out of and in the course of employment;
(2) an injury caused by a willful or negligent act of a third person directed against a covered employee in the course of the employment of the covered employee....

" 'Covered employee' means an individual listed in Subtitle 2 of [the Act] for whom a person ... is required by law to provide coverage under [the Act]." § 9–101(f). The Act applies to an employer "who has at least 1 covered employ-

---

1. Unless otherwise indicated, hereafter in this opinion reference to the Act shall mean the Workers' Compensation act and reference to a section shall be to a section of that act.

ee." § 9–201(1). Generally, "an individual ... is a covered employee while in the service of an employer under an express or implied contract ... of hire." § 9–202(a). Ordinarily, "each employer of a covered employee shall provide compensation in accordance with [the Act]"

> to the covered employee for an accidental personal injury sustained by the covered employee....

§ 9–501(a)(1). "An employer is liable to provide compensation in accordance with subsection (a) of [§ 9–501], regardless of fault as to a cause of the accidental personal injury." § 9–501(b). The Act commands that it "shall be construed to carry out its general purpose." § 9–102(a). It declares: "The rule that a statute in derogation of the common law is to be strictly construed does not apply to this [Act]." § 9–102(b) These dictates are to assure that the Act's benevolent purpose as remedial social legislation will be effectuated. *Alitalia Linee Aeree Italiane, et al. v. Tornillo*, 329 Md. 40, 617 A.2d 572, 576 (1993); *Lovellette v. City of Baltimore*, 297 Md. 271, 282, 465 A.2d 1141 (1983).

## II

Carol Belcher sought compensation under the Act. Upon a plenary hearing, the Workers' Compensation Commission disallowed her claim. She took her cause to the Circuit Court for Baltimore City. The court ruled in accord with the Commission. Belcher sought relief in the Court of Special Appeals. We intervened before the intermediate court entertained the case and, on our own motion, certified it to us for resolution. 328 Md. 35, 612 A.2d 897 (1992).

## A

We learn of the circumstances leading to Belcher's claim for compensation through the transcript of the hearing before the Commission and from a statement of facts gleaned from that transcript and agreed upon by the parties.

Belcher was employed as a secretary for T. Rowe Price Foundation, Inc. Her desk was in the northwest corner of the top floor in downtown Baltimore's IBM building. Another office high-rise was being erected next to the IBM building, and the din of nearby construction made its way into Belcher's workplace. Occasionally she had trouble hearing people on the phone. At times the floor beneath her would vibrate, and things would bump on the roof. Overall, the intrusions were barely tolerable. Then on the morning of 11 April 1991 disaster struck. A three-ton beam being hoisted by a construction crane broke loose and tumbled some twenty feet, crashing without warning through the thick concrete roof over Belcher's head. It landed five feet from where she sat at her desk tending to the day's business. The sound was deafening; it was if a bomb had exploded. The lights in the office went out; pipes and wires were ripped apart; debris sifted over her and her surroundings; concrete dust went down her throat. "I couldn't move. I could not get up to move out of the way." Her employer immediately sought trauma counselling for her. The counselling proved to be ineffective. She "suffered sleep disturbances, nightmares, heart palpitations, chest pain, and headaches as a result of the occurrence." She came under the care of a psychiatrist, Alan H. Peck, M.D., for "evaluation and treatments for the emotional/mental trauma [she] suffered as a result of this injury, this accident." She saw him some twenty-two times. Dr. Peck's reports were introduced into evidence at the hearing. His initial report, under date of 8 May 1991 included a history of the accident. When the beam fell

> [s]he was frozen in fear, did not know what had happened and wondered if it had been a bomb. She was quite shaken. She seemed to have had some amnesia for the next several hours but was told that she was shaking, chain smoking and holding onto the walls. She was, at that point, quite cold and may have been in shock. Concrete pieces were all over her bodice. There are still some nuggets present on her desk. She went home early

that day, quite upset, could not sleep, and ironed the entire night. She returned to work the next day and found she could not look up at the building although she did enter it and try to do her job. She has had serious emotional problems since this incident which have been quite bothersome for her. Prior to the incident she saw herself as a very solid woman in control who enjoyed the ability to have some say over her life and was proud of her work history particularly at the T. Rowe Price Company. She has raised three children and always felt that she could take care of whatever came her way. Now she is upset over the fact that she is unsure and her chest constantly hurts as does her shoulder. Headaches occur and she often has dry mouth. She is fearful of a heart attack. She feels like she may explode. She has panic attacks at work and sometimes has to leave the area. She is fearful that she may not be able to return. She has had ongoing nightmares, waking up screaming several times and, in each nightmare, she herself has been killed. She finds she now is easily startled and has become quite irritable with loved ones particularly her children which bothers her. She has had some weight gain, a loss of senses and, at times feels "as if she is dead".

Dr. Peck in his last report before the hearing, stated that he had first seen her "for symptoms of a Post Traumatic Stress Disorder (PTSD) as a result of a work related incident...." He said:

In addition to some physical problems, the most important aspect has been the overwhelming psychological problems for Miss Belcher.

He opined that Belcher "suffers a Post Traumatic Stress Disorder as a result of this incident."

He concluded:

According to the Guides of the Evaluation of Permanent Impairment, 3rd Edition of the American Medical Association, Miss Belcher suffers a Class 3 impairment or moderate impairment where "impairment level are incom-

patible with some but not all useful function," or a 40% psychiatric disability as a result of this incident.

There was no evidence that Belcher had received treatment for any purely physical condition, or for any of her physical manifestations.

The Commission issued an order which set out that a hearing had been held on the following issues:

1. Did the employee sustain an accidental personal injury arising out of and in the course of employment?
2. Is the disability of the employee the result of an accidental personal injury arising out of and in the course of employment?

The Commission found that

the claimant did not sustain an accidental injury arising out of and in the course of employment as alleged to have occurred on 11 April 1989; and finds that the disability of the claimant is not the result of the alleged accidental injury....

The Commission disallowed Belcher's claim.

## B

The Commission's disallowance of Belcher's claim prompted her appeal to the Circuit Court for Baltimore City. She asserted that the holdings of the Commission were erroneous. Each side filed a motion for summary judgment. After hearing arguments from counsel at the hearing on the motions, the judge found it

hard to believe with all the Workmen's Compensation cases that have passed through these courts and the courts of the State of Maryland, that there has not been a case that is on all fours with this....

He thought that the issue presented was

whether or not a purely mental condition is compensable where there is no physical injury.

He deemed it to be "really a simple issue, but complicated to interpret...." He suggested that "[o]ne could argue either side of this ... very comfortably, ... as both [coun-

sel] have," and "[b]ased on what I have read, the courts could go in either direction, quite honestly." He recognized that the Act is to be liberally construed under the law, but he warned, "liberal construction does not change the meaning of the words." He iterated: "There has not been a case such as this ... when there is no medical treatment but purely mental treatment." He doubted that in such circumstances the Act permitted compensation. He opined that the Court of Special Appeals had so indicated in *Le v. Federated Dep't Stores*, 80 Md.App. 89, 560 A.2d 42 (1989), but, he observed, the Court of Appeals has not spoken on the matter. He concluded:

"As I am bound by the law and not a law writer, I will [in accord with *Le*,] abide by what I believe the law is today. And for that reason [Belcher's] Motion for Summary Judgment will be denied. The [employer's] Motion for Summary Judgment will be granted."

It is apparent that the Commission as well as the circuit court relied on the opinion of the Court of Special Appeals in reaching its holdings. The case was argued at length at the hearing before the Commission and the hearing ended on these words by counsel for the employer: "I rely upon the Thach Le case." As far as the Commission and the circuit court were concerned, they were governed, in our silence on the matter, by the law announced in *Le* by the Court of Special Appeals.

## III

The "Thach Le" case, *Le v. Federated Dep't Stores*, 80 Md.App. 89, 560 A.2d 42, to which the employer's counsel referred and the circuit court cited, was an action seeking damages for the torts of false arrest, defamation, and intentional infliction of emotional distress.[2] The Circuit

---

**2.** The tort of intentional infliction of emotional distress was first recognized in Maryland fifteen years ago. *See Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977), affirming *Jones v. Harris*, 35 Md.App. 556, 371 A.2d 1104 (1977).

Court for Montgomery County held that the exclusivity clause of the Workmen's Compensation Act[3] precluded the action. The court granted summary judgment in favor of the employer. The Court of Special Appeals reversed, but it did so for a reason not relied on by the circuit court.

The question in the view of the Court of Special Appeals was whether non-physical tortious acts committed against Thach Le by a fellow employee fell within the ambit of the then-styled Workmen's Compensation Act so as to preclude direct suit against the employer. It reasoned that since "[t]here was no claim for any physical injuries" to Le, his claim was not compensable under the Act. Therefore, it did not fall within the ambit of the Act at all, and thus the exclusivity provision was not applicable. 80 Md.App. at 90, 560 A.2d 42. The intermediate appellate court took the position that "tort actions are not barred by [the Act] when the essence of the injury is non-physical." *Id.* at 92, 560 A.2d 42. It stated that this Court, in interpreting "accidental injury" under the Act, has held that the term "means *physical injury* to the person caused by some unusual condition or occurrence in the employment." *Id.* at 91, 560 A.2d 42 (emphasis in original). It was the intermediate appellate court's notion that an injury is compensable only when there is an accidental physiological change arising out of and in the course of employment. *Id.* at 91, 560 A.2d 42. In other words, the absence of a physiological change or physical harm or damage precludes a finding that an injury under the Act occurred. *Id.* The court concluded that the circuit court erred in granting summary judgment in favor of the employer and gave this explanation:

---

**3.** The "Workmen's Compensation Act" was formerly codified as Art. 101 of the Maryland Code. By Acts 1991, Ch. 8, Art. 101 was revised and transferred to a new Labor and Employment article as Title 9 under the heading "Workers' Compensation."

Section 15 of Art. 101 (§ 9–509 in the new Labor and Employment Article) provided, with certain exceptions, that compensation under the Act to a covered employee was exclusive against the employer.

The quiddity of false arrest, defamation, and intentional infliction of emotional distress is non-physical. Those torts are ordinarily outside the scope of the Workers' Compensation Act. Since they are not within the Act, the statute does not protect the employer from actions grounded on those particular torts.

80 Md.App. at 93, 560 A.2d 42. The intermediate appellate court pointed out:

Neither the Court of Appeals nor [the Court of Special Appeals] has heretofore addressed the question of whether non-physical injury torts are within the ambit of the Act. . . .

*Id.* at 92, 560 A.2d 42.[4]

We reviewed the judgment of the Court of Special Appeals in *Federated Stores v. Le,* 324 Md. 71, 595 A.2d 1067 (1991) on our grant of certiorari. We affirmed the judgment of the Court of Special Appeals but rejected its reasons. Instead, we looked to § 44 of Art. 101 (now in revised form as § 9–509(d) of the Labor and Employment article) which provided:

---

**4.** Eight years before the Court of Special Appeals decided *Le* it decided *Sargent v. Board of Educ., Balto. Co.,* 49 Md.App. 577, 433 A.2d 1209 (1981). In the circuit court here Belcher looked to *Sargent* to support her claim, but the court found that it was not on point because in *Sargent* there was evidence of physical injury, whereas in the case at hand, as the Belcher court viewed it, there was no evidence of physical injury.

Sargent's job was to enter a boiler to clean it. While entering the boiler she suffered an attack of claustrophobia which disabled her, to the extent that she was temporarily unable to maintain the composure necessary to continue her work. She sought compensation under the Act. The evidence established, however, that the nervous shock sustained by her attempt to enter the boiler caused her to blackout which the Court of Special Appeals ruled as "a physiological injury . . . sufficient to qualify as an accidental personal injury under [the Act]." 49 Md.App. at 584–585, 433 A.2d 1209, quoting *Geipe Inc. v. Collett,* 172 Md. 165, 190 A. 836 (1937). So it seems, the Court of Special Appeals tempered to some extent the physical injury concept by finding that an accidental injury under the Act may directly cause a mental illness which then results in a physical disability. In other words, a psychological injury with physiological overtones may be compensable.

> If injury or death results to a workman from the deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child, children or dependents of the employee shall have the privilege either to take under this article or have cause of action against such employer, as if this article had not been passed.

We construed § 44 as decisive of the issue. We held that "under the facts of this case, the circuit court should not have granted [the employer's] motion for summary judgment...." 324 Md. at 87, 595 A.2d 1067.

So it was that we had no need to determine whether injuries psychological, emotional or mental in nature, as distinguished from those purely physiological, were within the purview of the Act. The status of such trauma under the Act was left in limbo by this Court.

The question of the compensability of injuries under the Act which are in essence psychological, emotional or mental, as distinguished from those which are purely physiological in nature, is now squarely before us. This Court is not bound by the decisions of the Court of Special Appeals, although we have ofttimes found them to be persuasive. So it behooves us to determine the propriety of the intermediate appellate court's statutory interpretation of "injury" as used in the Act.

## IV

### A

As we have seen, the Act does not define "injury" in terms of physical or mental trauma, and what the Legislature intended in that respect is not apparent from the language of the Act. So we are called upon once again to divine what the Legislature meant when it spoke of "accidental personal injury." We turned first to see how our predecessors on this Court viewed the term "accidental personal injury."

We began our review with *Schemmel v. Gatch & Sons etc. Co.,* 164 Md. 671, 166 A. 39 (1933) and then examined

what we believe to be a fair sampling of cases touching on the question decided thereafter. We then reviewed discussions of "injury" in the context of compensation under the Act in the following cases: *Moller Motor Car Co. v. Unger,* 166 Md. 198, 170 A. 777 (1934); *Geipe, Inc. v. Collett,* 172 Md. 165, 190 A. 836 (1937); *Jackson v. Ferree,* 173 Md. 400, 196 A. 107 (1938); *Foble v. Knefely,* 176 Md. 474, 6 A.2d 48 (1939); *Baltimore & Ohio R.R. Co. v. Zapf,* 192 Md. 403, 64 A.2d 139 (1949); *Kelly–Springfield Co. v. Daniels,* 199 Md. 156, 85 A.2d 795 (1952); *Caled Products Co., Inc. v. Sausser,* 199 Md. 514, 86 A.2d 904 (1952); *Greenwalt v. Brauns Bdg. Sp. Corp.,* 203 Md. 313, 100 A.2d 804 (1953); *Stancliff v. H.B. Davis Co.,* 208 Md. 191, 117 A.2d 577 (1955); *Beth. Steel Co. v. Golombieski,* 231 Md. 124, 188 A.2d 923 (1963); *Giant Food, et al. v. Gooch,* 245 Md. 160, 225 A.2d 431 (1967); *Mize v. Beauchamp Associates,* 245 Md. 583, 227 A.2d 5 (1967). In the cases we have surveyed, it seems that the Court did not have occasion to address directly the nature of an injury per se. They focus, in the main, on whether an injury was "accidental" rather than on its composition. So in *Schemmel,* 164 Md. at 680, 166 A. 39, the Court spoke of an "accident" but it did so in terms of "any mischance resulting in physical injury to the bodily tissues...."

*Geipe,* 172 Md. at 171, 190 A. 836, was more informative. The Court observed that an "accidental personal injury" within the scope and meaning of the statute need not be caused by physical impact or direct injury to the body. Such an injury may be

> a nervous shock that produces not a mere emotional impulse but a physiological injury as the proximate effect of an unforeseen or unexpected event....

*Id.*

In *Jackson,* 173 Md. at 403, 196 A. 107, the Court stated: Such an injury as the statute contemplates means any fortuitous, casual, and unexpected happening which causes personal disability or death....

*Daniels,* 199 Md. at 159, 85 A.2d 795, indicated that an injury is accidental "even without any external happening of an accidental nature." But physical trauma was present. The Court explained that an accidental injury may be the

sudden and unexpected rupture of some portion of the internal structure of the body, as cerebral hemorrhage or apoplexy, or the failure of some essential function of the body, as heart failure or paralysis, brought about by the exertion of the employee while engaged in the performance of his duties, or by the conditions of the employment....

*Id.*

■ The Court in *Sausser,* 199 Md. at 520, 86 A.2d 94, spoke of an "accidental personal injury" in terms of "a physical injury...." and in *Greenwalt,* 203 Md. at 318, 100 A.2d 804, the Court opined that the meaning of "accident" in Workmen's Compensation cases "includes any mishap which results in physical injury...." *Golombieski,* 231 Md. at 129, 188 A.2d 923, citing to *Schemmel* and *Zapf,* pointed out that under the Act

the meaning of "accidental" has been extended to include the rupture of an aneurysm and other internal injuries in order to give the word a more liberal construction in harmony with the general intent of the law and make the injury compensable.

This Court has further held that symptoms of injury can follow the incident by some lapse of time and still be considered the natural result of an "accident." In other words, the harm does not have to be immediate or coincide with the accident. *Unger,* 166 Md. at 203, 206–207, 170 A. 777.

We gather from these cases that our predecessors embraced, with some qualifications, for the Workers' Compensation act the common law's notion that an injury solely to one's mind is *damnum absque injuria* unless accompanied by physical harm. We indicated, however, that the physical injury need not be caused by physical impact or harm

directly to the body but may be the result of a nervous shock. Furthermore, the injury need not be externally apparent, but may be to the internal structure of the body, as for example, cerebral hemorrhage, apoplexy, heart failure or paralysis. The symptoms of injury need not be immediately apparent but may follow the accident by some lapse of time. Some of the cases may be viewed as suggesting that psychological injuries may be compensable when they result in physiological trauma, but none of them expressly answer the question.

## B

The matter of injuries of a mental or emotional nature arises in tort actions founded in negligence and in actions under the tort of intentional infliction of emotional distress, (see note 2, *supra* ). In the absence of a textually demonstrable legislative intent to exclude from compensability those accidental injuries that result in mental harm alone and in the lack of a definitive answer in our Workers' Compensation cases, we turn to tort cases.

We culled the following cases: *City Pass. Ry. Co. v. Kemp.*, 61 Md. 74 (1883); *P., B. & W. R. Co. v. Mitchell*, 107 Md. 600, 69 A. 422 (1908); *Green v. Shoemaker*, 111 Md. 69, 73 A. 688 (1909); *Balt. & Ohio R.R. Co. v. Harris*, 121 Md. 254, 88 A. 282 (1913); *Patapsco Loan Co. v. Hobbs*, 129 Md. 9, 98 A. 239 (1916); *Tea Company v. Roch*, 160 Md. 189, 153 A. 22 (1931); *Bowman v. Williams*, 164 Md. 397, 165 A. 182 (1933); *Mahnke v. Moore*, 197 Md. 61, 77 A.2d 923 (1951); *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979).

In *Kemp*, 61 Md. at 81, the Court referred to the general rule that

in actions of tort [founded on negligence] the wrong-doer is liable for all the direct injury resulting from his wrongful act, and that too although the extent or special nature of the resulting injury could not, with certainty, have been foreseen or contemplated as the probable result of the act done.

*Mitchell*, 107 Md. at 607, 69 A. 422, found that

[t]he weight of authority both of text books and of
decided cases supports the view that there can be no
recovery of damages for mere fright or mental suffering,
caused by negligence, unconnected with physical impact
or injury. This conclusion has generally been reached in
reliance upon the remoteness of the damage as well as
the inexpediency of opening the door to claims difficult of
precise proof or disproof and from their nature easy of
simulation and liable to exaggeration.

The Court refrained from expressing any opinion upon the
adequacy of mere fright or its results, when unaccompanied
by physical impact or injury, as a cause of action for
damages, because in "[its] judgment there is sufficient
evidence in the record before us to go to the jury ...
physical impact and injury to the [injured person being]
contemporaneous with her fright...."

*Id.* at 607–608, 69 A. 422. The Court explained:

While the physical impact or injury requisite for the
purpose under discussion must be actual it need not be
such as to occasion an external wound or bruise. Severe
and even incurable internal injuries, of which there is no
immediate visible or external evidence, may be produced
by violence or accident.

*Id.* at 608, 69 A. 422.

The circumstances in *Green*, 111 Md. 69, 73 A. 688, were
remarkably like the circumstances in the case now before
us. The defendants were blasting rocks in the vicinity of
Rebecca Green's dwelling. She testified that the first blast

knocked nearly half the plastering from the wall of the
room she was in, and part of the ceiling; none of it then
fell on her, though some fell on [another woman's] child.
It seemed to lift the house up and then let it fall. It
broke every glass in the window except one. It threw the
table upside down. It broke two dozen jars belonging to
[her] in the cellar of the house.

111 Md. at 73, 73 A. 688. Ten days later

a stone burst through the roof and ceiling and came down
through [Rebecca's] bed, mattress and spring, and broke

the slats and rollers. It weighed 22 pounds. That blast tore the window sash out, broke some in two, and threw them across the room.

*Id.* Her reaction is recounted on pages 73 and 74 of 111 Md., 73 A. 688. She and her husband did not sleep in that bed for six weeks after that. They were "in terror all night of being killed." She said:

[M]y nerves were completely broken down through fright, and I was not able to do my work. Before that time I was in ordinary health, and never was nervous. Since then I have had no health at all.

Her doctor attended her for "this nervousness," seeing her daily the latter part of April, and thereafter every week or so until fall. According to her doctor she "developed nervous prostration" which he attributed to the shock of the blasting. Her husband testified that "his wife had become a nervous wreck; that she was thirty years of age, and before this blasting had always attended to all her household duties, but since then has been unable to do so." The question relevant to our inquiry was

Does a cause of action lie for physical injury resulting from fright and nervousness caused by the wrongful acts of [another]?

The Court observed:

There is a wide divergence of judicial opinion as to whether a cause of action will lie for actual physical injuries resulting from fright and nervous shock caused by the wrongful acts of another....

111 Md. at 77, 73 A. 688. But, the Court posited:

[I]t may be considered as settled, that *mere fright, without any physical injury resulting therefrom,* cannot form the basis of a cause of action.

*Id.* (emphasis in original). The Court explained:

This is so, because mere fright is easily simulated, and because there is no practical standard for measuring the

suffering occasioned thereby, or of testing the truth of the claims of the person as to the results of the fright. But when it is shown that a *material physical injury* has resulted from fright caused by a wrongful act, and especially, as in this case, from a constant repetition of wrongful acts, in their nature calculated to cause constant alarm and terror, it is difficult, if not impossible, to perceive any sound reason for denying a right of action in law, for such physical injury.

*Id.* (emphasis in original).

The Court quoted at length from *Kemp,* 61 Md. 74, and set out the general rule recognized in *Kemp:*

"[T]he general rule is, in actions of tort like the present, that the wrongdoer is liable for all the direct injury resulting from his wrongful act, and that too, although the extent or special nature of the resulting injury could not, with certainty, have been foreseen or contemplated as the probable result of the act done."

*Id.* at 78. The Court looked with approval at *Sloane v. Southern Cal. R. R.,* 111 Cal. 668, 44 P. 320 (1896), in which there was no physical impact:

"The real question presented ... is, whether the subsequent nervous disturbance of the plaintiff was a suffering of the body or of the mind. * * * The nerves and nerve centres of the body are a part of the physical system, and are not only susceptible of lesion from external causes, but are also liable to be weakened and destroyed from causes primarily acting upon the mind. If these nerves, or the entire nervous system are thus affected, there is a physical injury thereby produced; and if the primal cause of this injury is tortious, it is immaterial whether it is direct, as by a blow, or indirect, through some action upon the mind."

111 Md. at 79, 73 A. 688. The Court conceded

that the numerical weight of authority supports the general rule that there can be no recovery for nervous affections unaccompanied by contemporaneous physical

injury, but the sounder view, in our opinion, is, that there are exceptions to this rule, and that where the wrongful act complained of is the proximate cause of the injury, within the principles announced in *Kemp's Case, supra,* and where the injury ought, in the light of all the circumstances, to have been contemplated as a natural and probable consequence thereof, the case falls within the exception and should be left to the jury.

*Id.* at 81, 73 A. 688.

The Court referred to *Denver & R. G. R. Co. v. Roller,* 100 F. 738 (9th Cir.1900), in which the jury was instructed as follows:

"If great fright was a reasonable and natural consequence of the circumstances in which the collision aforesaid, with the ensuing wreckage, explosion and conflagration, placed the plaintiff, and if she was actually put in fright by those circumstances, and injury to her health was a reasonable and natural consequence of such fright, and was actually and proximately occasioned thereby, then said injury is one for which damages are recoverable."

111 Md. at 82, 73 A. 688. The *Green* Court declared that "[t]he reasoning upon which that conclusion was reached is, in our opinion, sound...." *Id.* The *Roller* Court explained:

We all know, by common knowledge, that serious results may naturally follow from bodily injuries, without breaking an arm, or leg, or bones of the body. The body and mind are so intimately connected that the mind is very often directly and necessarily affected by physical injuries. A nervous shock, without a blow to the person, might, under some circumstances, be so great as to cause bodily injury.

100 F. at 748. We have set out *Green* in such detail because it is much cited, quoted and relied upon in our

opinions.[5]

*Harris*, 121 Md. 254, 88 A. 282, was a case which looked to *Green* in holding that there can be injuries from fright without physical impact. The injury in *Harris* was the result of a fall caused by the shock and fright produced by the sudden loud blowing of a locomotive whistle and escape of steam. *Hobbs*, 129 Md. 9, 98 A. 239, was another *Green*-based case. A woman in a hospital bed was harassed by a debt collector to the extent that she went into shock. She was so mentally disturbed that she suffered convulsions. The convulsions caused severe hemorrhaging so that the surgery which had been performed on her had to be performed again. The court held that the loan company was liable for all of her injuries. Twenty-two years after *Green*, we decided *Roch*, 160 Md. 189, 153 A. 22. The manager of a grocery store, as a joke, sent Roch a package containing a dead rat. She alleged that when she saw the rat, instead of the loaf of bread she had been expecting, she

> became very sick and ill in body and mind, fainted and fell with great force to the floor, and as a result thereof her nervous system suffered and still is suffering excruciating physical pain and mental anguish and other injuries were then and there sustained by her.

*Id.* at 191, 153 A. 22. The Court flatly declared:

> Under the decisions of this Court damages may be recovered for physical injuries caused by fright or shock.

*Id.* The Court cited to *Green*, *Kemp*, *Harris* and *Hobbs*.

*Bowman*, 164 Md. 397, 165 A. 182, nourished the seed planted in *Green*. Williams was at home, his wife was in

---

5. The Court in *Green v. Shoemaker*, 111 Md. 69, 78, 73 A. 688 (1909), declaimed:

> It is ... a matter of common knowledge that as a general rule, the nerves of women are more sensitive to injury that those of men, are more easily disturbed, and that when so disturbed, the injurious consequences are more serious and lasting.

> William Shakespeare said in Hamlet, Act I, scene ii: "Frailty, thy name is woman!"

> We do not suggest that these observations of the Court and the Bard are in tune with modern times.

the kitchen and his two children were in the basement. From a window in the front of the house, Williams saw a large truck loaded with coal coming down a steep icy hill. Out of control, the truck crashed into the stone foundation of the side of the house. Williams did not sustain any physical impact nor did the violent jar to the house cause him to fall.

> The fright of the plaintiff and his alarm for the safety of his two young sons occasioned by this accident were, however, such a shock to his nervous system that he fell to the floor of the dining room immediately after the impact of the truck with the fabric of the house, and was carried into the kitchen in a weak and hysterical condition. The doctor was sent for, and the plaintiff remained in bed for two weeks under regular medical treatment.

164 Md. at 399, 165 A. 182. Williams was unable to work for six months.

> From a state of normal health, [Williams] immediately became and continued quite weak and nervous, as was manifested to his family physician and an expert consultant in nervous disorders, by tangible evidence not susceptible of simulation, and by the absence of any physical reason for his condition.

*Id.* The Court observed that "the primary effect upon the personality of [Williams] was the fright it caused him, since his person was untouched...."

*Id.* at 401, 165 A. 182. The Court opined:

> In fright a man's whole being reacts. The shock to his nervous system is reflected in instinctive excitement and intensive action of the muscles and organs of the body, and so it is clear that the mental state has a corresponding physical accompaniment, although there has been no impact suffered. "The fear's as bad as falling."

*Id.* The Court noted:

> When fear exists, the nervous and physical reactions, although probably differing in degree, are fundamentally identical, whether the fear is purely subjective, as when it

is for the victim's own safety, or is objective, as when the fear is for the victim's wife, child, relative, friend, or even a stranger.

*Id.* The Court concluded: "[I]f a party suffers an injury, as loss of health, of *mind*, or of life, through fear of safety for self [or members of his family], a recovery may be had for the negligent act of another...." *Id.* (emphasis added). The Court observed that

the nervous shock or fright sustained by [Williams] was based on reasonable grounds for apprehension of an injury to [him] and his children, and was one which naturally produced physical deterioration as distinguished from those shocks which primarily work on the moral nature, to the exclusion of actual physical injury.

*Id.* at 402, 165 A. 182. The Court read *Green, Harris, Hobbs* and *Roch* as having

settled the principle that a plaintiff can sustain an action for damages for nervous shock or injury caused, without physical impact, by fright arising directly from defendant's negligent act or omission, and resulting in some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or *mental state.*

*Id.* at 404, 165 A. 182 (emphasis added).

*Mahnke,* 197 Md. 61, 77 A.2d 923, applied the rulings in *Green* and *Bowman.* It noted:

At the beginning of this century, the numerical weight of authority in this country supported the rule that a plaintiff cannot recover for nervous affections unaccompanied by contemporaneous physical injury.

197 Md. at 69, 77 A.2d 923. But it reminded, citing *Green:*

In 1909, however, this Court adopted the rule that where the wrongful act complained of is the proximate cause of the injury and the injury ought to have been contemplated in the light of all the circumstances as a

natural and probable cause thereof, the case should be left to the jury.

*Id.* In *Mahnke,* as in *Bowman,* there were no physical injuries inflicted, only severe psychological trauma. Her physiological harm was, as set out in *Bowman,* no more than a physical result which ordinarily flows from a severe mental state.

In any event, *Vance,* 286 Md. 490, 408 A.2d 728, clarified the matter. One of the questions presented in *Vance* was whether, under the "physical injury" test set forth in *Bowman,* damages may be recovered for emotional distress resulting from a negligent misrepresentation. *Id.* at 492, 408 A.2d 728. The Court discussed *Green, Roch* and *Bowman* and cited to *Mahnke.* The Court concluded:

> We think it clear that *Bowman* provides that the requisite "physical injury" resulting from emotional distress may be proved in one of four ways. It appears that these alternatives were formulated with the overall purpose in mind of requiring objective evidence to guard against feigned claims.

286 Md. at 500, 408 A.2d 728. "The first three categories," the Court explained, "pertain to manifestations of a physical injury through evidence of an external condition or by symptoms of a pathological or physiological state." *Id.* The fourth category, however, permits proof of a "physical injury" by evidence indicating a *"mental state...."* *Id.* (emphasis added). The Court formed this conclusion consistent with the holdings in *Green, Bowman* and *Roch.* *Id.* The Court observed:

> In the context of the *Bowman* rule, therefore, the term "physical" is not used in its ordinary dictionary sense. Instead, it is used to represent that the injury for which recovery is sought is *capable of objective determination.*

*Id.* (footnote omitted, emphasis added).

The type of evidence of a mental state resulting in an injury "capable of objective determination" was illustrated by the distress suffered by Muriel Vance. She and Arnold

Vance, married in a religious ceremony, lived together for 18 years and had two children. Then Arnold left Muriel for another woman. She sought a decree awarding her alimony and child support. Arnold opposed the action on the ground that at the time of his marriage to Muriel he had not been divorced from his first wife and, therefore, his marriage to Muriel was void. It appeared that Arnold originally believed that his decree of absolute divorce from his first wife was final, and had told Muriel that he was free to marry her. About one month after their marriage, Arnold discovered that his divorce decree had not become final until after his marriage to Muriel. Arnold never told Muriel that their marriage was a nullity. She did not discover it until Arnold sought to annul the marriage 20 years later.

The evidence at trial was that the disclosure that Muriel's twenty-year marriage was void had a devastating effect on her.

> She went into a state of shock, engaged in spontaneous crying and for a period seemed detached and unaware of her own presence. She was unable to function normally, unable to sleep and too embarrassed to socialize. In addition to experiencing symptoms of an ulcer, Muriel suffered an emotional collapse and depression which manifested itself in her external condition, *i.e.*, her significantly deteriorated physical appearance—unkempt hair, sunken cheeks and dark eyes.

*Id.* at 501, 408 A.2d 728. We held that this evidence was "legally sufficient to establish symptoms of a mental state evidencing a physical injury within the meaning of the *Bowman* standard."

*Id.*

> The evidence showed that Muriel suffered an objectively manifested, definite nervous disorder of a magnitude similar to the mental distress established in *Green, Bowman,* and *Roch....*

> [T]he evidence was sufficient to support a jury finding that Muriel was physically injured as a foreseeable result

of [Arnold's] negligent misrepresentation concerning his marital status.

*Id.* (footnote omitted).

Arnold argued that because Muriel adduced no medical evidence to support her claim for mental distress, the case should not go to the jury. We observed that although use of medical testimony may be advisable to establish mental distress, such testimony is not always required. *Id.* at 502–503, 408 A.2d 728. The Court ruled that such testimony was not necessary in the case before it to recover for mental distress in the light of the evidence adduced. *Id.* The Court also rejected Arnold's claim that the only proper way to show causation is through medical testimony. *Id.* at 503, 408 A.2d 728. The Court pointed out that it had "permitted plaintiff lay persons to testify to their physical injuries and mental distress without supporting medical testimony." *Id.*, citing to *Tully v. Dasher*, 250 Md. 424, 244 A.2d 207 (1968) (nervousness, headaches, upset stomach). *Tully*, the Court pointed out, relied on *Wilhelm v. State Traffic Comm.*, 230 Md. 91, 185 A.2d 715 (1962), which distinguished between situations where the cause of injuries need not be proved by expert testimony, and situations that require medical proof. *Vance* quoted *Wilhelm* 230 Md. at 99, 185 A.2d 715:

> "There are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability claimed by a plaintiff does not need to be established by expert testimony. Particularly is this true when the disability develops coincidentally with, or within a reasonable time after, the negligent act, or where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen...."

286 Md. at 503, 408 A.2d 728. "These occasions," we noted in *Vance*,

> were distinguished from situations involving complex medical questions, and especially cases turning on purely

subjective symptoms or in instances where there is a significant temporal lapse between the disability and the negligent act. In the second type of situation proof of causation must be by expert testimony.

*Id.*

■ *Vance's* explication of *Bowman* is, at this time, the definitive Maryland case on mental distress as the basis of damages in negligent tort actions. It carefully traced the evaluation of that concept. The traditional rule, formulated in the nineteenth century, did not permit damages solely for mental distress. *Vance,* 286 Md. at 496, 408 A.2d 728.

Instead, damages for mental distress had a parasitic status; recovery was dependent upon an immediate physical injury accompanying an independently actionable tort.

*Id.* Furthermore, "[t]he early cases generally denied recovery for mental distress when the alleged personal injury resulted solely from the internal operation of mental or emotional stresses...." *Id.* There developed an exception to this rule when there was physical impact upon a person coincident in time and place with the occasion producing the mental distress. *Id.* 496–497, 408 A.2d 728. The "impact rule," on occasion, was stretched to extreme limits to permit recovery for mental distress, and we rejected the rule in *Green, Id.* at 497, 408 A.2d 728. As we have seen, *Green* adopted "a rule—later characterized as the 'modern rule'— which permitted recovery of damages for negligent infliction of mental distress if a 'physical injury' results from the commission of a tort, regardless of impact." *Id. Roch,* as we have noted, stated that "damages may be recovered for physical injuries caused by fright or shock." 160 Md. at 191, 153 A. 22. Then *Bowman* was decided. It was accepted as "the leading Maryland case on the recovery of damages for negligently inflicted emotional distress...." *Vance,* 286 Md. at 499, 408 A.2d 728. *Vance* elaborated on the term "mental state" suggested in the more liberal *Bowman* rule. *Vance* posited that in addition to the ways of proving the requisite "physical injury" resulting from emotional distress, which pertain to manifestations of a

physical injury through evidence of an external condition or
by symptoms of a pathological or physiological state, the
requisite "physical injury" may be proved "by evidence
indicative of a 'mental state' ... capable of objective deter-
mination." 286 Md. at 500, 408 A.2d 728. It, thus, defined
"physical injury" to include demonstrable emotional dis-
tress. We take this as the present status of the law of
Maryland—in tort actions, damages may be recovered for
emotional distress capable of objective determination. In
other words, under *Vance*'s definition of "physical injury",
damages resulting from harm psychological in nature may
be obtained, independent of physiological harm, provided
the cause and effect of psychological harm are established.

■ The *Vance–Bowman* standard went far to dispel the
fear that the right to damages for emotional distress would
open the floodgates to feigned claims. Those opposing the
right argued that, upon the ground of expediency, the right
should be denied, because of the damages of opening the
door to fictitious litigation and the impossibility of estimat-
ing damages. *Green* answered this argument:

> The argument from mere expediency cannot commend
> itself to a Court of justice, resulting in the denial of a
> logical legal right and remedy in *all cases*, because in
> *some* a fictitious injury may be urged as a real one. The
> *apparent* strength of the theory of expediency lies in the
> fact that nervous disturbances and injuries are sometimes
> more imaginary than real, and are sometimes feigned, but
> this reasoning loses sight of the equally obvious fact that
> a nervous injury arising from actual physical impact is as
> likely to be imagined as one resulting from fright without
> physical impact, and that the former is as capable of
> simulation as the latter.

111 Md. at 81, 73 A. 688. (emphasis in original). W. Page
Keeton, *Prosser and Keeton on the Law of Torts* (5th ed.
1984), recognized the problem as very real, but as one that
must be met:

> Mental disturbance is easily simulated, and courts which
> are plagued with fraudulent personal injury claims may

be unwilling to open the door to an even more dubious field. But the difficulties may not be insuperable.

*Id.* § 54, p. 361. Keeton pointed out:

Not only fright and shock, but other kinds of mental injury are marked by definite physical symptoms, which are capable of medical or other objective proof.

*Id.* (footnote omitted). He suggested:

It is entirely possible to allow recovery only upon satisfactory evidence and deny it when there is nothing to corroborate the claim, or to look for some guarantee of genuineness in the circumstances of the case. The problem from this perspective is one of adequate proof, and it is not necessary to deny a remedy in all cases because some claims may be false.

*Id.* (footnote omitted). Keeton also looked to the effect on the defendant:

And where the concern is to avoid imposing excessive punishment upon a negligent defendant, it must be asked whether fairness will permit leaving the burden of loss instead upon the innocent victim.

*Id.* *Vance* adequately answered the troubling basic policy issues surrounding the definition of the limits of liability for negligently inflicted emotional harm by requiring that such harm be capable of objective determination. Such an objective determination provides reasonable assurance that the claim is not spurious. Where this assurance can be found, so that the mental distress appears to be real and serious, there is no good reason to deny recovery. Where such assurance is not found, recovery should be denied. *See* Keeton, § 54, p. 362.

We have traced the development of the law of Maryland as interpreted in our judicial opinions concerned with liability for negligently inflicted mental harm, from a standard limiting such liability to purely physical trauma to a standard permitting recovery for damages for trauma resulting from purely emotional distress that can be objectively determined. The recognition that a person should be compensat-

ed for mental harm resulting from the negligent act of another is in accord with the ever increasing knowledge in the specialties which have evolved in the field of medicine and in the disciplines of psychiatry and psychology. Persons suffering from severe mental distress are no longer simply warehoused in Bedlam type institutions; they are treated by medical experts at no small cost. We are now aware that mental injuries can be as real as broken bones and may result in even greater disabilities.

## V

The meaning of "personal injury" in the contemplation of the Workers' Compensation act has not followed the path taken by the meaning of "physical injury" in tort actions. It seems, as demonstrated by the disposition of Belcher's claim, that there has been a steadfast adherence in Workers' Compensation cases to a standard we have found to be outmoded in tort cases—a standard which treats an injury only as "physical" in the dictionary meaning of "physical," that is, in relation to the body, not the mind, corporeal as opposed to mental.

The right to benefits under Workers' Compensation laws is "based largely on a social theory of providing support and preventing destitution, rather than settling accounts between two individuals according to their personal deserts or blame." 1 Arthur Larson, *The Law of Workmen's Compensation*, § 1.20 at 2 (1992) (hereinafter, Larson). In exchange for receiving compensation regardless of fault, an employee abandons the right to seek common law tort damages from the employer. Section 9–509 of the Act; *see also Cox v. Sandlers, Inc.*, 209 Md. 193, 198–199, 120 A.2d 674 (1956); some actions against third parties are still possible, though the proceeds of a successful lawsuit may at times be applied to reimburse the employer for the compensation payments. § 9–902(e)(2); *Railway Co. v. Assurance Corp.*, 163 Md. 97, 102–103, 161 A. 5 (1932); Larson, § 1.10 at 2; *cf. Anne Arundel County v. McCormick,*

323 Md. 688, 692–694, 594 A.2d 1138 (1991). The employer passed the expense of Workers' Compensation on to the consumer, "since compensation premiums, as part of the cost of production, will be reflected in the price of the product." Larson, § 1.10 at 2.

The ultimate social philosophy behind compensation liability is belief in the wisdom of providing, in the most efficient, most dignified, and most certain form, financial and medical benefits for the victims of work-connected injuries which an enlightened community would feel obliged to provide in any case in some less satisfactory form, and of allocating the burden of these payments to the most appropriate source of payment, the consumer of the product.

Larson, § 2.20 at 5.

█ Thus, the Act has a purpose broader than serving the interests of employers and their employees. More than merely indemnifying workers for injuries sustained on the job, the system embodied in the Act provides compensation when earning power is lost as a result of work-related disabilities. The needs and expectations of society, in addition to those of the work force, come into play. In *Knoche v. Cox*, 282 Md. 447, 449–450, 385 A.2d 1179 (1978), we found the rationale of the Act and its underlying philosophy clearly set out by the General Assembly in the Preamble to the original legislation:

"WHEREAS, The State of Maryland recognizes that the prosecution of various industrial enterprises which must be relied upon to create and preserve the wealth and prosperity of the State involves injury to large numbers of workmen, resulting in their partial or total incapacity or death, and that under the rules of the common law and the provisions of the statutes now in force an unequal burden is cast upon its citizens, and that in determining the responsibility of the employer on account of injuries sustained by his workmen, great and unnecessary cost is now incurred in litigation, which cost is borne by the workmen, the employers, and the taxpayers, in part, in

the maintenance of courts and juries to determine the question of responsibility under the law as it now exists; and

WHEREAS, in addition thereto, the State and its taxpayers are subjected to a heavy burden in providing care and support for such injured workmen and their dependents, which burden should, insofar as may be consistent with the rights and obligations of the people of the State, be more fairly distributed as in this Act provided; and

WHEREAS, the common law system governing the remedy of workmen against employers for injuries received in extra-hazardous work is inconsistent with modern industrial conditions; and injuries in such work, formerly occasional, have now become frequent and inevitable."

■ In the light of the language of the Act, the philosophy underlying it, and the purposes behind it, we believe that modern times call for the concept of "physical injury", which we have adopted with respect to emotional distress in tort actions to apply to "personal injury" under the Act. The provisions of the Act do not prohibit it; expediency has not proved to be a deterrent; the advances in medical science make it feasible; logic supports it; the needs of society require it. We have come to appreciate that a mind may be injured as well as a body maimed. A person's psychic trauma does not vary depending upon the type of legal action in which the harm is scrutinized. Disabilities are not lessened because compensation is pursued by way of the Act rather than by way of damages sought in a tort action. The inability to work and the loss of earning power are the same.

The human body consists of bones, flesh, ligaments, and nerves controlled by the brain. The law does not state which of these particular elements must produce the disability. If a disability exists, whether or not it is psychic or mental, if it is real and is brought on by the accident and injury, this being a humane law and liberally construed, it is nevertheless compensable.

This observation was made by a dissenting director when the case of *Indemnity Insurance Co. of North America v. Loftis,* reported in 103 Ga.App. 749, 120 S.E.2d 655, 656 (1961) was before the Workmen's Compensation Board on review. It is quoted with approval by the court in its opinion at 656 and is often cited by the courts and scholars as a sound principle. *See* Larson, § 42.23(a) at 7–911 (1992). We see no sound reason or just cause why the concept of "physical injury" which we have adopted in assessing damages in tort cases should not apply equally to the concept of "personal injury" in awarding compensation in Workers' Compensation claims.

> [T]here is no really valid distinction between physical and "nervous" injury. Certainly medical opinion would support this view, and insist that it is no longer realistic to draw a line between what is "nervous" and what is "physical." ... Perhaps, in earlier years, when much less was known about mental and nervous injuries and their relation to "physical" symptoms and behavior, there was an excuse, on grounds of evidentiary difficulties, for ruling out recoveries based on such injuries, both in tort and in workmen's compensation. *But the excuse no longer exists.* And therefore a state which would withhold the benefits of workmen's compensation from a man who, before an obvious industrial mishap, was a competent, respected iron-worker, and after the mishap was totally incapacitated to do the only job he was trained for, would nowadays be doing unjustifiable violence to the intent of the workmen's compensation act, for reasons that are without support in either legal or medical theory.

Larson, § 42.23 at 7–906 (emphasis added). *See Sparks v. Tulane Med. Ctr. Hosp. & Clinic,* 546 So.2d 138, 147 (La.1989). There is a caution, however. As *Sparks* puts it at 147:

> We emphasize, however, that a mere showing that a mental injury was related to *general conditions* of employment, or to incidents occurring over an extended period of time, is not enough to entitle the claimant to

compensation. The mental injury must be precipitated by an accident, i.e., an unexpected and unforeseen event that occurs suddenly or violently.

(Emphasis in original; footnote omitted). The cases note that

by rejecting the "nineteenth century approach" of making the availability of benefits dependent upon a rigid and absolute distinction between physical and mental injuries, ... we reach a result that has been approved by a majority of the jurisdictions in this country.

*Id.*

### VI

Due to the interest and concern of others than the immediate parties in the question before us, we granted a request to file a brief by *amici curiae.* The *amici curiae* participating in the brief stated that they

represent the entire spectrum of the workers' compensation payors in Maryland—self-insured employers, the Injured Workers' Insurance Fund, and trade organizations representing the overwhelming majority of workers' compensation insurers in the State.

They speak, of course, in support of T. Rowe Price and its insurer, and they proclaim that each of them

has a significant interest in seeing that workers' compensation coverage in Maryland remains limited to claims wherein an employee has a definite, immediate physical injury as a result of a work-related occurrence.[6]

The *amici curiae* urge that "the Maryland Workers' Compensation law should not be judicially expanded to include as 'accidental personal injuries' claims for mental conditions

---

6. The parties did not file additional briefs when this Court assumed jurisdiction over the case by grant of certiorari. They were content to proceed before us on the briefs filed by them in the Court of Special Appeals.

There was no motion requesting permission to file a brief as an *amicus curiae* in support of Belcher.

that involve no physical injury to the body." The gist of their argument is that we should adhere to the construction of the terminology used in the Act as requiring a physical injury to the body as a prerequisite to compensability which the Maryland courts have observed for more than half a century. They point out that "other states with statutory language and prior case law similar to that of Maryland have rejected attempts to judicially expand workers' compensation coverage to include non-physical injuries." We believe that we have fully answered such lines of argument, and we are not persuaded otherwise by the *amici curiae*. They do not acknowledge, as we have found, that

> [g]enerally, the trend in the law has been towards granting awards for mental injury resulting from mental stress.

Marc A. Antonetti, *Labor Law: Workers' Compensation Statutes and the Recovery of Emotional Distress Damages in the Absence of Physical Injury*, 1990 Annual Survey of American Law 671 at 695. Antonetti, in his analysis of the trend, sees the same justification in allowing mental-mental claims as we found:

> This trend toward allowing the mental-mental claim is justified by both the goals of workers' compensation laws and evidence regarding the nature of mental injuries. The primary goal of workers' compensation is to compensate disabled employees. If an individual is unable to work because of a job related injury, he remains disabled whether he was injured from either mental or physical stress. Therefore, workers' compensation laws should make allowances for the mental-mental claimant. Additionally, modern medical and psychological theory supports the proposition that those who are unable to work for psychological reasons are as disabled to the same extent as those who are physically injured.

*Id.* at 696 (footnote omitted). We are not at odds with Antonetti's comment that because "workers' compensation statues are drafted by the legislature, the judiciary should defer to legislative judgments." *Id.* at 698. "Neverthe-

less," he avers, and we are in complete accord, "the judiciary has a role to play in determining the compensability of workers' compensation claims." *Id.*

> When the legislature has failed adequately to define statutory terms, the court is obliged to interpret the law and decide on the best social policy. Additionally, courts modernize the law by interpreting statutes to their definitional limits.

*Id.* We have done precisely this and with reasonable safeguards.

The *amici curiae* have a final arrow in their quiver. They use it to try to shoot down Belcher with the assertion that

> [t]he legislative history of the term "accidental personal injury" during the 1991 recodification of the Maryland Workers' Compensation law demonstrates the legislative intent to continue to limit compensable claims to only those involving physical injuries to the person.

We do not see it that way.

The Department of Legislative Reference presented to the 1991 session of the General Assembly of Maryland a new Labor and Employment article, House Bill 1 (Acts 1991, ch. 8) and House Bill 692 (Acts 1991, ch. 21), prepared by it in accordance with its statutory responsibility to revise the Annotated Code. Included in the revision was a "Plain English" recodification of Article 101—The Workmen's Compensation Act. We have exhausted the legislative file on the bills, maintained by the Department of Legislative Reference. The Department's "Overview" of HB 1 explained that "[t]he goal in revising is to rewrite the law in a more clear and concise manner without making any substantive changes.... Thus, while the language of a revision differs from the derivative statute, the legislative intent does not change." In the case of workmen's compensation the understanding of the practical application of the Act was derived largely from case law.

The Department's "Report on House Bill 1" proposed that the workers' compensation law be Title 9 in the new Labor and Employment article. Section 9–101(b) was to define "accidental injury," as "(1) an accidental injury that arises out of and in the course of employment; (2) an injury caused by a willful or negligent act of a third person ...," in accord with the former Art. 101, § 67(6). The Maryland Chamber of Commerce reacted to the proposed revision. The attorney who chaired the Workers' Compensation Committee of the Chamber of Commerce wrote the Chairman of the House Economic Matters Committee expressing "concern and opposition to the *new* definition of 'accidental injury' " because it "removes the word 'personal' from the current substantive use of accidental *personal* injury." (Emphases in original). He claimed:

> This is a substantive change from the current law and it eliminates a very substantial and fundamental defense historically available since 1914 and applied uniformly by our courts over the past seventy-six years.

He observed:

> A letter from the Legislative Analyst assigned to the Article Review Committee concedes that there is a potential problem with the proposed new definition of accidental injury if the Maryland Court of Appeals were to interpret the term "accidental injury" to include other than physical injuries.

He requested that the word "personal" be included in the definition of injury.

The Director of Industrial Relations of the Maryland Chamber of Commerce followed this with a letter to the Chairman of the Senate Rules Committee, in which, among a number of suggestions with respect to the revision of other laws, he said that the Chamber was "concerned about the deletion of the word 'personal' from the very basic defined term 'accidental personal injury' in the workers' compensation title.... We continue to believe," he asserted, "that the use of the term 'accidental injury' leaves open the possible interpretation that the law is intended to com-

pensate for psychological damages as well as physical damages." He too urged "the use of the term 'accidental personal injury' in the workers' compensation definitions."

We discovered in the legislative file a "Bill Analysis" prepared by the House Economic Matters Committee concerning HB 692. The "Summary" of the Analysis was: "This bill makes the technical changes and changes to cross-references made necessary by House Bill 1 (Code Revision)." It gave as the background of the bill:

> This bill is a companion bill to House Bill 1 (Labor and Employment Article) bill and makes all the *technical changes* necessary to other portions of the Code that are affected by the Revision.

(Emphasis added). The Analysis explained that the Economic Matters Committee had appointed a Subcommittee on Code Revision that examined the proposed changes suggested at the hearing on HB 1. Among the "technical changes" the Subcommittee had accepted was

> Argument that "Accidental injury" should be changed to "accidental personal injury" (proposed by the Maryland Chamber of Commerce)....

The *amici curiae* take the insertion of the word "personal" back into the proposed statute as an indication of clear legislative intent not to permit compensation for mental trauma. We cannot perceive that the Legislature intend any such thing based on fears of what the Court of Appeals *might* do. As far as we are able to ascertain, the inclusion of the word "personal" was deemed by the Legislature as a mere "technical" change, not a substantive one. It cannot be taken as an expression of legislative intent to foreclose compensation for mental harm. Had the Legislature any doubt about the matter, it could very easily have declared that psychological harm is not compensable. The Overview to HB 1 noted that "[a] by-product of the revision process is identification of substantive problems that exist in the law."

> Although a code revision bill is not a vehicle for correcting substantive problems, they are discussed in notes following each section of the revision.

The Special Revisor's Note to § 9–101(b) headed "Accidental personal injury" did not suggest that there was a substantive problem with respect to the word "personal." The Note provides a plain explanation why the phrase "accidental personal injury" was used:

> In the introductory language of [§ 9–101(b) ], Chs. 8 and 21, Acts of 1991, deleted the former terms "injury," "personal injury," and "accidental injury" as unnecessary, since the term "accidental personal injury" is used consistently throughout this title to avoid confusion.

*See Office & Prof. Employees Int'l v. MTA,* 295 Md. 88, 101, 453 A.2d 1191 (1982) ("The notes or reports of a revisor or revision commission are entitled to considerable weight in ascertaining legislative intent."). *See also Dean v. Pinder,* 312 Md. 154, 163, 538 A.2d 1184 (1988) ("It is a well-settled practice of this Court to refer to the Revisor's Notes when searching for legislative intent of an enactment.").

The inclusion of the word "personal" apparently quieted the fears of the Chamber of Commerce. Nevertheless, in the circumstances, we do not think that this action demonstrated a legislative intention to preclude compensation for emotional distress.

## VII

 Belcher presented two questions on her appeal to the Court of Special Appeals and we accepted them in our grant of certiorari. She asked:

(1) Is a mental condition compensable under the [Act] where there is no physical injury?

(2) Did Belcher suffer such psychological reaction from the accidental injury sufficient to qualify as a compensable accidental personal injury?

The first question is a matter of law. The answer is "yes" in the context of the *Vance* definition of "physical injury," which we have now applied to a "personal injury" in the contemplation of the Workers' Compensation act. That is, an injury under the Act may be psychological in nature if the mental state for which recovery is sought is

capable of objective determination. Inasmuch as the circuit court decided that the answer was "no", it erred in granting the motion for summary judgment made by the employer and in denying the summary judgment made by Belcher.

The second question concerns a matter of fact. In the appeal before us, as briefed and argued by the parties, it is not disputed that, in the contemplation of the Act, Belcher was a covered employee; T. Rowe Price was her insured employer; whatever injury she suffered was personal; that the injury arose out of and in the course of her employment and was either accidental or was caused by the negligent act of a third person. So the only question remaining is whether Belcher suffered sufficient psychological reaction from the alleged injury to qualify for compensation. The question must now be resolved by the application of the *Vance* standard to the evidence adduced on the issue. This is best accomplished on a rehearing before the Commission, which may review the evidence presented at the first hearing and such additional evidence as the Commission deems necessary or advisable. Of course, counsel shall be afforded the opportunity to be heard. Accordingly,

JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-MORE CITY REVERSED;

CASE REMANDED TO THAT COURT WITH DI-RECTION TO REMAND THE CASE TO THE WORKERS' COMPENSATION COMMISSION WITH DIRECTION TO VACATE ITS ORDER DISALLOWING PETITIONER'S CLAIM FOR COMPENSATION AND TO CONDUCT FUR-THER PROCEEDINGS PURSUANT TO THIS OPINION;

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPON-DENT.

RODOWSKY, Judge, concurring in which McAULIFFE and CHASANOW, JJ. join

I join in the Court's judgment, but not in the opinion, the rationale of which is, in my view, so expansive as to be legally incorrect.

The late Richard P. Gilbert, formerly Chief Judge of the Court of Special Appeals, and Robert L. Humphreys, Jr., in *Maryland Workers' Compensation Handbook* (1988), have synthesized a rule from the Maryland cases that should be applied here. At § 5.2, "Personal Injury," those authors state:

"A review of case law shows that a compensable injury may be found whenever an accidental physiological change is found to have arisen out of and in the course of employment. There is no statutory nor decisional requirement that the injury arise concurrent to or immediately after the accident.

"The absence of a physiological change or physical harm or damage should preclude a finding that an injury occurred. For this reason, emotional or mental disorders are not properly classified as accidental injuries unless they arise from an accidental event *and* include a physiological component."

*Id.* at 85–86 (footnotes omitted).

In the instant matter, the accidental event requirement of this rule is dramatically satisfied. The requirement for a physiological change is also satisfied, at least to the extent that it was satisfied in *Sargent v. Board of Educ. of Baltimore County*, 49 Md.App. 577, 433 A.2d 1209 (1981). *Sargent* involved a building custodian who was required to enter a boiler to clean it. "She blacked out for several hours, which is clearly a physiological reaction, and afterwards, was temporarily unable to maintain the composure necessary to continue her work." *Id.* at 584–85, 433 A.2d at 1213. The Commission awarded compensation, making "implicit in its decision that [the claimant] did suffer a physical change in response to her claustrophobic reaction to entering the boiler." *Id.* at 584, 433 A.2d at 1213. The Court of Special Appeals concluded "that there was sufficient evidence to support [the claimant's] contention that she suffered a physiological injury." *Id.* Thus, the *Sargent* court, after having found error in a circuit court's conclusion that there was no accident, also rejected an alternate ground for

sustaining the circuit court's judgment by holding that the evidence of personal injury was sufficient.

In the instant matter the circuit court's ruling in favor of the employer is on summary judgment. The circuit court distinguished *Sargent* on the ground that the claimant here did not black out. There is, however, sufficient evidence to generate a factual issue that Belcher sustained physiological injury as the result of the accident. It could be found that, as a result of the accident, she suffered amnesia for several hours, was involuntarily shaking, became quite cold and was in shock, and that she suffers chest and shoulder pains, headaches, panic attacks, sleeplessness and nightmares. I would hold that this evidence generates a jury issue on physiological change. Certainly, Belcher's claim is more demonstrable than is a claim based on complaints of pain in the low back, allegedly resulting from an unusual, twisting motion at work, which can be compensable, if believed, even though the complaints cannot be objectively corroborated.

On the foregoing analysis, the instant matter is not a case in which there is "an injury solely to one's mind," unaccompanied by physical harm. 329 Md. 709, 721, 621 A.2d 872, 878 (1993). Consequently, there is no need to attempt to condense into a single phrase the body of Maryland tort law bearing on damages for emotional distress (said to be "a standard permitting recovery for damages for trauma resulting from purely emotional distress that can be objectively determined"). *Id.* at 735, 621 A.2d at 885. Whether or not the foregoing statement accurately condenses Maryland tort law, it should not be imported into the Workers' Compensation Act (the Act).

The expansive rationale of the majority opinion takes a state of facts which, under the *Sargent* analysis, presents a "physical-mental claim," and resolves it by recognizing a "mental-mental claim" as a compensable claim. "Physical-mental claims involve a physical injury which leads to a mental disability; for example, a conversion neurosis following a traumatic injury." D. DeCarlo, *Workplace Stress:*

*Trends, Outlook and Perspectives* 258 (Am.Ins.Ass'n.1987). "Mental-mental claims refer to mental stress which results in a mental disability; for example, a nervous breakdown brought on by job harassment or termination." *Id.*

The majority erects a "caution"—the " 'mental injury must be precipitated by an accident.' " 329 Md. at 740, 621 A.2d at 887 (quoting *Sparks v. Tulane Medical Ctr. Hosp. & Clinic,* 546 So.2d 138, 147 (La.1989)). What the majority apparently considers to be an appropriately compensable mental-mental claim, and what the majority considers to be the appropriate scope of the accident requirement, are illustrated in the favorably cited *Sparks* decision.

The claimant was hired by the employer hospital in 1980. She worked for four years in distribution of medical supplies, was promoted to regular work-week manager of the distribution center in 1984, and stopped work in April 1987. Relatively early in her employment, she had complained to her supervisor about co-workers smoking marijuana, and she had cautioned a co-worker about possible drug possession. From time to time property was stolen from the storeroom, including some belonging to the claimant, and there were acts of vandalism, some of which might have been directed at the claimant.

In 1987, at a staff meeting, the claimant expressed her opinion that a weekend crew, in the charge of another supervisor and responsible for restocking supply shelves, had been performing poorly. In protest of the criticism, two of the weekend employees refused to restock at all on the following weekend. When a senior supervisor decided that the protestors should be suspended for five days, the weekend supervisor told the claimant that " 'a lot of people around here want to kick your butt.' " *Id.* at 141.

A majority of the Supreme Court of Louisiana held that, as a matter of law, the communication of threats to the claimant was an accident, and that her fright and upset over the threats, which resulted in an emotional disability,

was the injury. *Id.* at 148. "The Louisiana legislature reacted quickly to the *Sparks* decision, passing amendments to the statute in agreement with the dissent's reasoning." M. Antonetti, *Labor Law: Workers' Compensation Statutes and the Recovery of Emotional Distress Damages in the Absence of Physical Injury,* 1990 Ann.Surv. of Am.Law 671, 680 (footnote omitted) (Antonetti).

I disagree with the majority's approval of " 'allowing the mental-mental claim [as] justified by both the goals of workers' compensation laws and evidence regarding the nature of mental injuries.' " 329 Md. at 741, 621 A.2d at 888 (quoting Antonetti at 696). The legislative history of the recodification of the Maryland Workers' Compensation Act makes plain to me the General Assembly's intent that mental-mental claims should not be compensable. Further, the General Assembly's ongoing interest in, and concern over, the costs of workers' compensation dictate judicial restraint rather than an expansion of benefits by judicial fiat, based on the majority's view of " 'the best social policy.' " *Id.* at 742, 621 A.2d at 888 (quoting Antonetti at 698).

The Act was recodified from former Art. 101 of the Md. Code to Title 9 of the Labor and Employment Article of the Code by Chapter 8 of the Acts of 1991. It was introduced as House Bill 1 on January 9, 1991, and referred to the Economic Matters Committee. As proposed by the staff of the Legislative Division of the Department of Legislative Reference (the Revisor), and as introduced, § 9–101(b) created a definitional term used throughout the Act—"accidental injury." By letter of January 16, 1991, the chairperson of the Workers' Compensation Committee of the Maryland Chamber of Commerce wrote to the Chairperson of the House Economic Matters Committee opposing this definition and urging that proposed Title 9 use the term, "accidental personal injury," that had been used, albeit not uniformly, in. Art. 101. Although the Revisor's Note to § 9–101, that was included in House Bill 1, indicated that no substantive change was intended, the position taken by the

Chamber of Commerce was not devoid of merit. We have recently pointed out, speaking through Judge Eldridge, that "personal injury . . . normally connotes a physical injury to a victim." *United States v. Streidel*, 329 Md. 533, 539, 620 A.2d 905, 909 (1993). The Chamber of Commerce in part pointed out that "[a] letter from the Legislative Analyst assigned to the Article Review Committee concedes that there is a potential problem with the proposed new definition of accidental injury if the Maryland Court of Appeals were to interpret the term 'accidental injury' to include other than physical injuries."

Companion legislation to the proposed new Labor and Employment Article was House Bill 692, prepared to correct throughout the Code cross-references that would be rendered obsolete by the new Labor and Employment Article. House Bill 692, introduced on February 1, 1991, also was referred to the House Economic Matters Committee. That committee amended House Bill 692 by inserting a new § 5 to the bill, consisting of eighteen printed pages. 1991 Md. Laws 1170–87. The amendments changed the Revisor's definitional term "accidental injury" to "accidental personal injury" and inserted that term throughout proposed Title 9. House Bills 1 and 692 were reported favorably by the House Committee on March 1, 1991; both were passed by the House on March 6, 1991; both were introduced into the Senate on March 7, 1991; and both were enacted. House Bill 1 was enacted on March 21 while House Bill 692 was enacted on March 22 as Chapter 21 of the Acts of 1991.

In the Maryland Code the combined effect of both bills appears under the Revisor's Note to § 9–101 that has remained unchanged from its introductory form in House Bill 1. But the General Assembly did not agree with the Revisor that there was no difference between "accidental injury" and "accidental personal injury." We should not consider that the General Assembly engaged in a useless act when it caused amendments to be made throughout the Act. Clearly the general purpose of the amendments was

to prevent a judicial interpretation of "accidental injury" that included "other than physical injuries."

At the time of the legislative amendments, however, the Court of Special Appeals in *Sargent* had already interpreted "accidental personal injury" to include physiological changes. Thus, while I agree that Belcher's claim is not barred, I also believe that this Court should respect the intent of the General Assembly and refrain from covering the purely mental-mental claim with the mantle of "accidental personal injury."

Further, recent and ongoing executive and legislative economic studies that seek to balance benefit to workers against cost to employers should dictate against this Court's economically uninformed disruption of that balance by expanding the Act to include mental-mental claims. On December 31, 1985, the Maryland Department of Economic and Community Development (DECD) issued a report that compared Maryland's workers' compensation costs in fifty-one occupational classes with those of twenty-nine other states. DECD, *Workers' Compensation in Maryland* 34 (1985) (the DECD Report). It found that Maryland "ranked in the high-cost third of the 30 states with respect to Standard Earned Premium (SEP), indemnity losses, and total losses." [1] *Id.* at 73. The Report also found that "Maryland ... ranked in the high-cost third in all categories under permanent partial injuries, including indemnity losses, medical losses, total losses and claim count." *Id.* Identified as possible areas of reform were permanent partial awards, medical cost containment, use of standardized medical guides, competitive rating—modified file-and-use, data collection and reporting, and safety in the workplace. *Id.* at 77–84.

---

1. "Standard earned premium (SEP) is the total premium paid (or contracted to be paid) by employers in a given risk classification based on manual rates and experience rating *at the beginning* of the policy period. The SEP sometimes is identified as the *gross premium* because it is a gross estimate of employers' average cost of workers' compensation insurance." DECD Report at 40.

On December 31, 1985, another group, the Ad–Hoc Working Group on Workers' Compensation (the Working Group), issued a report, also entitled, "Workers' Compensation in Maryland." Working Group, *Workers' Compensation in Maryland* (1985). The Working Group was comprised of members from organized labor, the business community, and "researchers familiar with the availability and quality of data on Maryland's workers' compensation experience." *Id.* at 3. The Working Group's purpose was "to propose cost effective initiatives for Maryland's workers' compensation system." *Id.* at 1. In its report, the Working Group made numerous recommendations, several of which were the same as those made in the DECD Report.

By Executive Order 01.01.1986.11, on June 5, 1986, Governor Hughes established the Governor's Commission to Study the Worker's Compensation System (the Commission). 13 Md.Reg. 1575 (July 3, 1986). The impetus for the Governor's Executive Order came from the DECD Report and the Working Group's report. *See id.* The Executive Order charged the Commission with reviewing the laws, procedures and other matters relating to "the cost of workers' compensation and the efficient provision of adequate benefits to Maryland workers," and with recommending changes. *Id.*

The Commission replaced the Governor's Commission on Workmen's Compensation Laws. That commission "focused more on the issues of efficiency and fairness in the implementation of the worker's compensation law, and did not have the specific cost reduction mandate of the new Commission." Department of Fiscal Services, *Staff Report on Worker's Compensation in Maryland: Briefing Paper for the 1987 General Assembly* 10 (Jan. 19, 1987).

The Commission reported in January 1987. Governor's Commission to Study the Workers' Compensation System, *Report of the Governor's Commission to Study the Workers' Compensation System* (1987) (the Commission Report). The Executive Summary to the Commission Report stated:

"The workers' compensation system is a major social program in Maryland, providing Maryland's two million workers with remedies for work-related injuries and illnesses. Previous research studies have clearly established that the costs of the present workers' compensation system to Maryland employers are significantly increasing, and that Maryland is an expensive workers' compensation state. Comprehensive reform of Maryland's workers' compensation program is critical to achieving a modern, effective system that is both equitable and cost effective."

*Id.* at 1.

During its 1987 session, the General Assembly made substantial revisions to the Act. *See* Acts of 1987, chs. 590, 591. Among other things, Chapter 590 established a Workers' Compensation Benefit and Insurance Oversight Committee (the Oversight Committee). Acts of 1987, ch. 590, § 3. The Oversight Committee was charged with examining and evaluating "the condition of the workers' compensation benefit and insurance structure in Maryland" and the effects of the 1987 legislation. *Id.* The Oversight Committee must report by December 31 of each year to the Governor and the General Assembly. *Id.* It has done so. *See* Oversight Committee, *Reports of the 1889, 1990, 1991, and 1992 Interim to the Governor and the Maryland General Assembly.*

None of these studies expressly addresses the question of mental-mental claims, apparently because they have never been considered to be included in the Act and because there is no significant impetus to include them. Whether the Act should be expanded to include mental-mental claims requires an evaluation of costs and benefits to many interests that make up the economy of the entire State. It is, in my view, particularly inappropriate for this Court to decide that question in a case in which that issue need not be decided.

Judges McAULIFFE and CHASANOW have authorized me to state that they join in the views expressed in this concurring opinion.