*David P. Bogert, et al. v. Thomas A. Thompson, Jr., et al.*, No. 1171, Sept. Term, 2021.
Opinion by Salmon, James P. (Senior Judge, Specially Assigned)

**DAMAGES – EMOTIONAL DISTRESS CAUSED BY NEGLIGENT DAMAGE TO PROPERTY** – Ordinarily, a plaintiff cannot recover for emotional injury caused by witnessing or learning of negligent injury to the plaintiff's property. One exception to that rule is the personal safety exception, which provides that there may be recovery when the defendant's negligence causes property damage that results in emotional injuries that are due to the plaintiff's reasonable fear for the safety of himself/herself or for the member(s) of his or her family. For the personal safety exception to be applicable, the plaintiff need not witness the accident so long as he or she was aware of it immediately after the accident occurred and that awareness caused the plaintiff to reasonably fear for his/her own safety or the safety of his or her family member(s).

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1171

September Term, 2021

_____

DAVID P. BOGERT, ET AL.

v.

THOMAS A. THOMPSON, JR., ET AL.

_____

Kehoe,
Nazarian,
Salmon, James P.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Salmon, J.

_____

Filed:  July 28, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In the early morning hours of September 22, 2019, Thomas A. Thompson, Jr. ("Mr. Thompson") crashed his truck into the house where the appellants (identified *infra*) resided. None of the appellants were struck by the truck, but they claim that the crash caused them emotional injuries.

Ordinarily, a plaintiff "cannot recover for emotional injury caused by witnessing or learning of negligently inflicted injury to the plaintiff's property." *Dobbins v. Washington Suburban Sanitary Com'n*, 338 Md. 341, 345 (1995). There are two exceptions to this rule. One exception is that there may be recovery in cases involving property damage caused by fraud, malice or like motives. *See Zeigler v. F Street Corp.*, 248 Md. 223, 226 (1967). A second exception is known as the personal safety exception, which provides that there may be recovery when the defendant's negligence causes property damage that results in emotional injuries that are due to the plaintiff's reasonable fear of safety for himself/herself or for members of his or her family. *See Dobbins*, 338 Md. at 345-46 n.1 and 351 n.4, *Belcher v. T. Rowe Price*, 329 Md. 709, 729 (1993), and *Bowman v. Williams*, 164 Md. 397, 401 (1933).

The issue that separates the parties in this appeal is whether the personal safety exception is here applicable. The appellants: David P. Bogert; his wife, Holyn R. Bogert; David P. Bogert and Holyn R. Bogert as husband and wife; David P. Bogert as father and next friend of A. A. Bogert, a minor; and David P. Bogert as father and next friend of A. E. Bogert, a minor; (collectively "the Bogerts") contend that the Circuit Court for Harford County, Maryland erred when it granted summary judgment against them on the grounds that the personal safety exception was inapplicable. The Bogerts also claim that even if

the personal safety exception was inapplicable, summary judgment should have been denied because Mr. Thompson's "breach of duty foreseeably caused the Bogerts to suffer emotional distress and other related damages capable of objective determination." Mr. Thompson, on the other hand, contends that the personal safety exception was here inapplicable. According to appellee, because the personal safety exception was inapplicable, as a matter of law, appellants were barred from recovery for their alleged emotional distress because such distress was not the foreseeable result of appellee's negligent damage to appellants' property.

Taking the evidence, as we must, in the light most favorable to the non-moving party (here the Bogerts), there was sufficient evidence produced in the circuit court to show that the personal safety exception to the usual rule was applicable and that the plaintiffs' emotional distress was foreseeable.[1] Therefore, we shall hold that the circuit court erred in granting summary judgment in favor of Mr. Thompson and against the Bogerts.

## I.

### BACKGROUND FACTS

The facts set forth in part I of this opinion are based on the deposition testimony of Mr. and Mrs. Bogert, interrogatory answers filed by the appellants, and photographs of the

---

[1] A circuit court's grant of a motion for summary judgment is reviewed *de novo*. *Dashiell v. Meeks*, 396 Md. 149, 163 (2006); *Rockwood Cas. Ins. Co. v. Uninsured Employer's Fund*, 385 Md. 99, 106 (2005). "Prior to determining whether the trial court was legally correct, an appellate court must first determine whether there is any genuine dispute of material facts." *Meeks*, 396 Md. at 163. "Any factual dispute is resolved in favor of the non-moving party." *Id*. (citing *Jurgensen v. New Phoenix Atlantic Condominium*, 380 Md. 106, 114 (2004)).

damage caused by the accident. For purposes of summary judgment, Mr. Thompson assumes, as do we, that what was said in the interrogatory answers and the depositions is true. With one exception, discussed *infra*, there are no issues of material facts.

On September 22, 2019, the Bogerts lived at 217 Colgate Road, Forest Hill, Maryland, in a four-bedroom townhouse that was connected to a row of four other townhouse units. The first floor of the Bogerts' home included a two-car garage, a dining room, a living room, and a kitchen. On the second floor, there were two bedrooms directly on top of the garage. On the night that Mr. Thompson crashed his truck into the Bogerts' garage, the two bedrooms above the garage were occupied by Mr. and Mrs. Bogert's daughters, A. A. and A. E. On the date of the accident, A. A. was eleven and A. E. four years younger. Also present in A. E.'s bedroom that night was a sleepover guest of hers.

The master bedroom, occupied by Mr. and Mrs. Bogert, was located on the second floor but down the hallway from the girls' rooms towards the back side of the house. The basement of the townhouse, below the garage, included a living space, another bedroom and a storage area.

On September 21, 2019, a Saturday, everyone in the Bogert household was in bed by 10:30 p.m. A. A. and A. E., along with A. E.'s friend, went to sleep in bedrooms directly above the garage, while Mr. and Mrs. Bogert went to sleep in the master bedroom.

At approximately 2:00 a.m. on September 22, 2019, Mr. Thompson, while driving under the influence of alcohol, lost control of his truck near the area of the first unit of the Bogerts' townhouse complex. His vehicle went airborne, canted to its side and then

3

crashed through the right wall of the Bogerts' garage before knocking out the full left wall and coming to rest in the garage directly under the girls' bedrooms.[2]

At the time that Mr. Thompson's truck struck the Bogerts' house, everyone in the household was asleep, but all were awakened by the loud noise the crash made, which Mr. Bogert later described as an "explosion" akin to a "mortar round hitting [the] house." The noise caused Mr. Bogert to experience a flashback to an incident that occurred in 2005 when he was serving in Iraq as a member of the U.S. Army. In that incident, he had survived a mortar strike on his housing unit that killed a fellow soldier and close friend. Initially, when the crash woke him, Mr. Bogert thought that he was having an auditory hallucination. He then realized that the sound that he heard was real and he thought, for an instant, that his house had been attacked.

Mrs. Bogert was also awakened by the crash. The noise sounded to her like "crumbling metal and a big boom." She sat up in bed and asked her husband if he had heard the noise. He said that he had and both Mr. and Mrs. Bogert realized that the noise seemed to come from the direction of their daughters' rooms. They jumped out of bed and ran down the hall to check on the safety of the children.

Mr. Bogert ran into A. E.'s bedroom and found his daughter and her friend sitting up in bed. Both girls were "terrified." A. E. asked her father what caused the noise. Mr. Bogert looked out the window and saw Mr. Thompson standing in the street and heard him yell "Luigi." At that point, Mr. Bogert was still disoriented and could not figure out what

---

[2] The accident was captured on film by a neighbor's surveillance camera.

was happening. He saw a blinking red light and smoke and dust rising to the second floor and thought that there may had been a fire on the first floor. Meanwhile, Mrs. Bogert ran into A. A.'s bedroom. She also noted a red flashing light out of A. A.'s window and ran down to the garage to look outside towards the street. When she opened the door that led from the house to the garage, her "brain couldn't process what was happening" and all she could see was smoke, dust and red flashing lights. When Mrs. Bogert saw her husband coming down the stairs, she went back upstairs to get the girls out of bed and to tell them to stay with her.

Mr. Bogert ran outside and saw Mr. Thompson staggering around in the front yard. To Mr. Bogert, Mr. Thompson did not seem to be in full possession of his mental faculties. Mr. Bogert told his family to go back inside and told his wife to call 911, which she did. After Mr. Bogert saw Mr. Thompson flee from the scene, he went back into the house to check on his family. At that point, the electricity was off because the crash had damaged the power box that was located on the left side of the garage.

After Mr. Bogert gave his family a flashlight to illuminate the living room, he ran upstairs, dressed, and then paced around anxiously waiting for emergency personnel to arrive. Mrs. Bogert, during that period, sat with the three girls and tried to comfort and reassure them.

Next, after the firemen and police arrived, the breaker box in the garage exploded and a building inspector noticed that the I-beam that supported the garage was lying on the floor of the garage. The inspector told Mr. Bogert that everyone had to leave the house immediately because the inspector feared that the upper part of the house might collapse.

5

Mr. Bogert ran into the house and told everyone that they had to leave because it might not be safe inside. The family then left the house and went to stay with a neighbor.

While at the neighbor's house, A. A. and A. E. were "very anxious" because of the incident, and both became sick and vomited. A. E. vomited about 30 to 45 minutes after the accident. Not long afterward, A. A. also vomited. Mrs. Bogert vomited later that morning.

At about 10:00 a.m., the family left the neighbor's house to stay at a hotel. By the end of that day, the Bogerts were still feeling stunned and numb and not able to believe that the incident had really happened.

According to Mr. Bogert's deposition testimony, the incident "reactivated" his post-traumatic stress disorder ("PTSD") that he initially experienced in Iraq, after the 2005 mortar attack. He testified that when he heard the crash, he "legitimately thought [he] was redeployed and [the family was] under attack."

In one of his interrogatory answers, Mr. Bogert said: "The [d]efendant's negligence and this traumatizing accident has brought all those past PTSD events back into focus, in addition to new anxiety issues because of the devastating thoughts that his whole family was at risk."

Two months prior to the September 22, 2019 accident, because of his PTSD, Mr. Bogert had been seen by a mental health counselor in Elkton. He continued to see that counselor post-accident, in part, because he needed to address the emotional distress he felt as a result of the subject accident. He told his counselor that he reacted to the accident the

6

same way that he reacted to the prior mortar attack and that post-accident he subsisted on very little sleep and "ran on adrenaline[.]"

According to Mr. Bogert's deposition testimony, the accident caused him to experience a worsening of his PTSD. Also, after the accident, he suffered from what he called "hypervigilance" and sensitivity to loud noises.

Mrs. Bogert said in her deposition that on the night of the accident she looked in her husband's eyes and "only saw his soldier self [and Mr. Bogert] was gone." His wife explained that when her husband went into his "soldier self," he acted as "Captain Bogert." His "Captain Bogert" personality phase lasted four or five days following the incident. She testified that her husband's transformation to Captain Bogert was very scary and created emotional distance between them.

Mrs. Bogert further testified that she personally experienced anxiety, heart palpitations, migraines, vertigo, nausea, ringing in her ears, difficulty sleeping, exhaustion, shortness of breath and difficulty in concentrating in the days following the accident. She visited her family medical practitioner to address the symptoms of vertigo and nausea. Later she went to see a mental health counselor at The Center for Trauma, Stress, and Anxiety, to receive help for the mental distress that she attributed to the accident.

According to Mrs. Bogert's deposition testimony, A. A. and A. E. experienced depression, sadness, anger and nervousness due to appellee's truck having crashed into the

7

garage. Post-accident, both A. A. and A. E. went to see a mental health counselor at the same facility where she had been treated.[3]

## II.

## HEARING ON THE SUMMARY JUDGMENT MOTION AND THE CIRCUIT COURT'S RULING.

In the motion for summary judgment, counsel for Mr. Thompson asserted that there could be no recovery, under the circumstances of this case, for emotional injuries suffered by any of the Bogerts resulting from damages to property. The Bogerts filed an opposition to the motion and the matter came on for hearing on October 4, 2021.

At the hearing, counsel for Mr. Thompson admitted that there is an exception to the ordinary rule that would allow recovery if Mr. or Mrs. Bogert experienced reasonable fear of physical injury to themselves or their children as a result of the property damage. Counsel argued that the key to understanding the exception was to examine the facts and holding in the 1933 case of *Bowman v. Williams*, *supra*. In that case, Mr. Williams was, at the time of the accident, in his home and his two children were in the basement of that home. 164 Md. at 398. From a window in the front of his house, Mr. Williams saw a large coal truck, out of control, descending a steep icy hill. *Id*. at 398-99. The truck crashed into the stone foundation of Mr. Williams' house around the basement. *Id*. at 399. Mr. Williams did not sustain any physical injury as a result of the crash nor did the violent jar to the house cause him to fall. Nevertheless:

---

[3] Our summary of the alleged injuries suffered by the Bogerts is not intended to cover everything that was covered in discovery concerning that subject. Instead, we have endeavored to recap only the main injuries the plaintiffs claim to have suffered.

[t]he fright of the plaintiff [Mr. Williams] and his alarm for the safety of his two young sons occasioned by this accident were, however, such a shock to his nervous system that he fell to the floor of the dining room immediately after the impact of the truck with the fabric of the house, and was carried into the kitchen in a weak and hysterical condition. The doctor was sent for, and the plaintiff remained in bed for two weeks under regular medical treatment.

*Id*. at 399.

The *Bowman* Court observed that "the primary effect of this wrongful act upon the personality of [Mr. Williams] was the fright it caused him, since his person was untouched[.]" *Id*. at 401. The Court summed up Mr. Williams' injuries by saying that he was unable to work for six months post-accident and that:

[f]rom a state of normal health, [Mr. Williams] immediately became and continued quite weak and nervous, as was manifested to his family physician and an expert consultant in nervous disorders, by tangible evidence not susceptible of simulation, and by the absence of any physical reason for his condition.

*Id*. at 399.

The *Bowman* Court said: "there is neither logic nor reason to hold . . . that a distinction is to be taken, so that, if a party suffer an injury, as loss of health, of mind, or of life, through fear of safety for self, a recovery may be had for the negligent act of another; but may not recover under similar circumstances, if the fear be of safety for another." *Id*. at 401. In *Bowman*, the Court allowed Mr. Williams to recover for emotional injuries after noting that:

[T]he nervous shock or fright sustained by [Mr. Williams] was based on reasonable grounds for apprehension of an injury to [him] and his children, and was one which naturally produced physical deterioration as distinguished from those shocks which primarily work on the moral nature, to the exclusion of actual physical injury.

9

*Id*. at 402.

At the summary judgment hearing in the subject case, counsel for Mr. Thompson argued that the facts in the subject case were distinguishable from those in *Bowman*. Defense counsel stressed that Mr. Williams actually witnessed the accident while, in the subject case, none of the four plaintiffs did. Moreover, according to defense counsel, the cases were distinguishable because in the subject case, purportedly, it was undisputed that Mr. and Mrs. Bogert did not fear for their personal safety as a result of the incident. Counsel for Mr. Thompson did not say whether the summary judgment record showed that: 1) the Bogert children did not fear for their own safety; or 2) that their parents, at the time they ran to the children's bedrooms, did not fear for the safety of the children.

Counsel for the Bogerts argued that under the rule set forth in *Bowman v. Williams*, his clients were entitled to recover because, *inter alia*, the evidence was sufficient to show that as a result of the crash, both Mr. and Mrs. Bogert had a reasonable fear for their own safety and the safety of their children. Additionally, plaintiffs' counsel, citing *Belcher*, *supra*, argued that for the personal safety exception to apply, the plaintiff need not show that he or she witnessed the accident if, as here, they were aware of it immediately after the accident occurred and that awareness caused them to reasonably fear for their own safety or the safety of a family member.

In her rebuttal argument, counsel for Mr. Thompson maintained that there was no Maryland case that allowed for recovery for mental injuries when the accident did not cause physical impact with the plaintiff and where all the mental injury occurred post-accident. The circuit court agreed with Mr. Thompson's counsel and ruled as follows:

I do think that *Bowman* is on point here, and it is a legal issue in this case, and I don't think that the exceptions apply. Here the fear that the plaintiffs faced was not related to the physical damage that occurred.

My reading of the depositions, my understanding of what they've said in their discovery is that relates [sic] more to looking at it when [sic] it could have happened, but that's not what *Bowman* requires in this case. It does require that there be something more attenuated [sic] than just simply a generalized fear of what could happen.

So for those reasons, I'm going to grant the Motion for Summary Judgment.

Appellants then filed this timely appeal.

## III.

## THE ARGUMENTS ON APPEAL

Appellants claim that the circuit court's grant of summary judgment should be reversed because:

> [a]ppellee's negligent acts place[d] the Bogerts in reasonable fear for their personal safety and the safety of their family members and caused the Bogerts to suffer measurable emotional injuries capable of objective determination, thereby meeting the exception to the general rule barring recovery for emotional injuries caused by negligently inflicted property damage.

Appellee counters that the personal safety exception is inapplicable and because the exception does not apply, appellants cannot recover inasmuch as emotional damages arising out of property damages are not foreseeable.

## IV.

## A. <u>Issue of Material Fact</u>

Before discussing, in detail, the first argument presented by appellants, it is important to note what is <u>not</u> at issue in this appeal. Appellee, for purposes of this appeal,

11

does not contend that as a result of his negligent acts, that the Bogerts suffered no emotional injury. He argues, instead, that under the circumstances of this case, the Bogerts are not entitled to recover for such injuries.

A reading of the briefs of the parties shows that there is only one disagreement as to material fact. Appellee claims that "[u]pon being awakened by the incident the [a]ppellants knew they were not in danger." It is clear that when appellee uses the word "appellants" in the above argument, he is referring to Mr. and Mrs. Bogart individually— not to A. A. or A. E. who, by their father and next friend, also are appellants.

We disagree with appellee's assertion that there is no dispute that after hearing the crash, Mr. and Mrs. Bogert knew that they were not personally in danger. At a minimum, there is a dispute of material fact in that regard. The following excerpt from Mr. Bogert's deposition is relevant:

> Q: [Counsel for appellee]: And what was [the] first indication that night that something was wrong around 2:00 a.m., when the incident occurred?
>
> A: A loud explosion woke me up.
>
> Q. And can you describe it for me?
>
> A. It sounded like a mortar round hitting my house.
>
> Q. And what did you do at that point?
>
> A. I thought I was having an audio hallucination, so I sat up in the bed, and in those nano seconds that were happening, **I thought that we were under attack**. I was discombobulated because I knew that should not be happening in this current location, I wasn't in harm's danger or harm's way, in any danger. I realized it was not a hallucination when I looked over and Holyn was also sitting up in bed, and she said to me, "What was that?" That's when we ran towards the kids['] room[s] to see what it actually was.

12

(Emphasis added.)

Later in Mr. Bogart's testimony, he testified that he thought the explosion came from the direction of A. E.'s room. He further testified:

> **I legitimately thought I was redeployed and we were under attack.** So, every bit of 2005, when the mortar round hit my room[,] came back, and I, for a time, **thought we had been attacked.**

(Emphasis added.)

Those excerpts, and the inference that can be legitimately drawn from those excerpts, could be interpreted by a fact-finder as meaning that after he heard what sounded like an "explosion," he initially thought he was not in danger because he believed he was hallucinating but he then realized that what he heard was not imaginary (because his wife had also heard the loud noise), which caused him to run to the front of the house to find out what caused what sounded like a mortar attack. Nor does Mr. Bogert's interrogatory answer, quoted at page 6, *supra*, support appellee's contention that there is no dispute of fact as to whether the sound of the crash caused him to fear for his own safety and that of his daughters.

Mrs. Bogert's testimony, in regard to what she thought immediately after she was awakened also undercuts appellee's "no dispute of material fact" argument, *viz.*:

> Q.     [Counsel for appellee]: When did you realize that something had happened that night?
>
> A.     I was awakened by a sound. It sounded like crumbling metal and a big boom.
>
> Q.     And what did you do at that point?

13

A.      Sat up in bed, looked over at [my husband], who sat up in bed. I said, did you hear that? He said, "There was a sound. It wasn't just me?" I said, "There was a sound." Then, we jumped out of the bed and ran towards the girls' rooms.

Q.      Then what do you remember about when you arrived [at] the girls' rooms?

A.      I remember Paul [Mr. Bogert] was ahead of me, and he ran into [A. E.'s] room, and I remember opening [A. A.'s] door, and seeing red flashing lights through her blinds. So, rather than go all of the way in her room, I rerouted and ran down the stairs and actually opened the garage door, because I knew that I could see the front of the house through the garage. Then, I opened it and I didn't understand what I was seeing because all I could see was, like, smoke, or dust, or fog, and the red flashing lights through it. My brain couldn't process what was happening in that moment.

Q.      Where were the red lights coming from, do you know?

A.      Just in front of me. I would anticipate it was some aspect of the [defendant's] truck, but, at the time, I didn't know what it was.

Read in the light most favorable to the appellants, Mrs. Bogert's reaction to the sound of the crash, coupled with the dangerous condition she saw when she entered A. A.'s room (and what she saw immediately thereafter), a fact-finder could legitimately find that Mrs. Bogert feared for her safety.

## B. The Parents' Fear for the Safety of Their Daughters

Even if neither Mr. or Mrs. Bogert feared for their own safety due to appellee's negligence, under the personal safety exception, they could nevertheless recover for emotional injuries if the defendant's negligent act caused them to have a reasonable fear for the safety of their children. *See Belcher*, *supra*, 329 Md. at 729 and *Bowman*, *supra*, 164 Md. at 401. In his brief, appellee does not discuss this point even though the Bogerts, in

14

their opening brief, argue that appellee's negligent act "caused the Bogerts to suffer a reasonable fear . . . for the safety of their [children.]"

In their depositions, neither Mr. nor Mrs. Bogert were asked whether the sounds that they heard that woke them caused them to fear for their children's safety. But it can be inferred from how they reacted to the sound that defendant's negligence did cause such fear. After all, they immediately jumped out of bed and ran to the girls' rooms which were in the direction from which they heard what Mr. Bogert said sounded like a "mortar round" hitting his house. Fear for the children's safety was also evidenced by what the parents did immediately after they entered the two bedrooms where A. A. and A. E. were located. Such fear on Mr. Bogert's part was also shown by his interrogatory answer, quoted *supra* at page 6.

### C. Fear of A. A. and A. E. for Their Own Safety

According to their parent's depositions, both A.A and A. E. were terrified by the crash that occurred immediately below their bedrooms. Their fear and anxiety were manifested by the fact that they both vomited shortly after the accident.[4]

### D. Failure of the Plaintiffs to Witness the Accident

Appellee appears to argue that the plaintiffs must have witnessed the accident for the personal safety exception to be applicable. His precise argument is as follows:

> [U]nlike the plaintiff in *Bowman*, the [a]ppellants had no "visible reason to apprehend that the impending peril caused by the negligent act or omission of the defendant [ ] with respect to [his] duty to [them] would not only happen but would also crush and damage the building and inflict the threatened

---

[4] As to A. A. and A. E., appellee does not even argue that at the time they woke up, they did not have a reasonable fear for their own safety.

15

physical injury upon [their] children . . . and [themselves]." *Bowman*, 164 Md. at 400. Rather, in the instant case[,] the [a]ppellants did not witness the crash at all and instead were merely awoken by the noise after the fact.

To the extent that appellee argues that to recover under the personal safety exception, a plaintiff must see the accident occur (as was the case of *Bowman*), we reject that contention. We can think of no reason, and appellee has not suggested one, why such a rule should exist. A tortious act that causes what sounds like a loud explosion and also causes damages to personal property in a plaintiff's home, would likely cause a plaintiff to be just as afraid for his safety and the safety of family members if he hears the explosion but does not see what caused it, as a plaintiff who sees the cause by witnessing the negligent act or acts unfold. The cases, cited by appellee, do not suggest otherwise. Those cases are *Green v. Shoemaker*, 111 Md. 69 (1909) and the more recent 1993 case of *Belcher v. T. Rowe Price*, *supra*.

In *Green*, the Court of Appeals permitted the plaintiff to recover for emotional distress and personal injuries that she suffered as a result of her house being damaged by the repeated blasting of rocks. The blasting resulted from explosives used by the defendant, a contractor for the B & O Railway Company. 111 Md. at 71. The plaintiff [Mrs. Green] testified that the first blast knocked nearly half of the plastering from the wall of the room that she occupied and part of the ceiling, although none of the debris fell on her. She also testified that the blast seemed to "lift the house up and then let it fall." *Id.* at 73. The blast tossed a table upside down and broke jars that were in the cellar of the house. *Id.* Ten days later, due to the blasting, a 22-pound stone burst through the roof and ceiling and came down through the plaintiff's bed, breaking the slats and rollers. *Id.* The blast tore the

16

window sash out, and threw the sash across the room. *Id.* As a result of the blast, plaintiff and her husband did not sleep in the bed that had been damaged because they were in fear of being killed. *Id.* Under the personal safety exception, Mrs. Green was allowed to recover for fright and nervous shock as a result of the defendant's damage to her property. *Id.* at 79-80. Appellee argues that *Green* is distinguishable from the subject case because in *Green*, the plaintiff was actually present and witnessed the results of defendant's tortious acts. That is true, but the same can be said for all the plaintiffs in the subject case. Moreover, there is no indication in *Green* that Mrs. Green actually witnessed the explosions that caused the damage.

The appeal in *Belcher v. T. Rowe Price* arose from a workers' compensation case in which Judge Orth, speaking for the Court of Appeals, had occasion to review, in detail, Maryland tort law concerning the issue of whether a plaintiff could recover for fear for personal safety when the negligent act did not cause physical impact to the plaintiff. 329 Md. at 722-36. On the morning of April 11, 1991, Carol Belcher was employed as a secretary for T. Rowe Price Foundation, Inc. Her office was on the top floor of a building next to a high-rise office building that was being erected. *Id.* at 713. While at her desk, a three-ton beam that was "being hoisted by a construction crane broke loose and tumbled some twenty feet, crashing without warning through the thick concrete roof over [Ms.] Belcher's head." *Id.* The beam landed five feet from where Ms. Belcher was seated. "The sound was deafening; it was [as] if a bomb had exploded." The lights in Ms. Belcher's office went out, "pipes and wires were ripped apart; debris sifted over her and her surroundings; concrete dust went down her throat" and she "could not get up to move out

17

of the way." *Id*. Ms. Belcher, post-accident, suffered from sleep disturbances, nightmares, heart palpitations, chest pain, and headaches as a result of the accident, which caused her to seek psychiatric help. *Id*. In *Belcher*, the Court reversed the grant of summary judgment entered by the circuit court and held that even though there had been no physical impact as a result of the contractor's negligent conduct, Ms. Belcher's proof, if credited, of her fright and psychiatric injury was sufficient to allow recovery. *Id*. at 745-46.

Appellee cites *Belcher* for the proposition that in order for the Bogerts to recover, they were required to prove that they witnessed the accident. ("[I]n stark contrast to the facts of *Belcher*, in the instant case the [a]ppellants did not witness any part of the accident as they were asleep on the second floor of their house at the time of the incident.") Ms. Belcher obviously saw the damage caused by the three-ton beam falling near her desk. But there is nothing in the *Belcher* case that indicates that the plaintiff actually "witnessed" the accident by seeing the beam coming loose and crashing through the roof. Most likely, Ms. Belcher was performing her secretarial duties, and looking elsewhere when the beam landed near her desk. The Court of Appeals didn't say whether she witnessed the accident. The Court's silence, impliedly at least, suggests that a plaintiff need not necessarily witness the accident in order to recover if the plaintiff is at the scene of the accident and experiences reasonable fear for his or her safety as a result of that accident.[5]

---

[5] Appellee cites no case which stands for the proposition that in order for the personal safety exception to apply, the plaintiff must prove that he or she was a witness to the accident.

18

### E. No Physical Damage to Place Where Plaintiffs Were Situated

Appellee also stresses that unlike the situation in *Green* and *Belcher*, "it is undisputed that not only were [a]ppellants not in fear for their lives, but there was also no visible damage to their bedrooms after the incident, and they did not sustain any [physical] injuries as a result" of the truck hitting the garage. The "no fear for their safety" issue has already been addressed. The fact that appellee's negligence did not cause damage to the bedrooms, is not dispositive as shown by *Bowman*, where the place where Mr. Williams was standing was not damaged although the basement of his house was. Moreover, as shown by *Bowman*, *Green*, and *Belcher*, it is not necessary for the plaintiff to show that the negligent act caused physical impact to the plaintiff's body.

### V.

### APPELLANTS' ALTERNATIVE ARGUMENT

Appellants assert:

This Court should reverse the circuit court's grant of summary judgment because even if the facts of this case did not meet the fear [for] safety exception, this is not a case where the Bogerts attempted to recover for emotional injuries caused by negligently inflicted property damage; here, [a]ppellee's breach of duty foreseeably caused the Bogerts to suffer emotional distress and other related damages capable of objective determination.

Appellee counters:

[W]hile [a]ppellants argue that they are entitled to recovery because their alleged emotional injuries were foreseeable, they have notably failed to cite any cases in which Maryland courts have permitted a plaintiff to recover for emotional injuries arising out of negligent property damage in which the court did not apply the physical safety exception. . . . As discussed *supra*, since the physical safety exception does not apply in this case, [a]ppellants'

19

claims fail as a matter of law and the circuit court's grant of summary judgment in favor of the [a]ppellee should be affirmed.

We agree with appellee that appellants cannot recover in this case unless the personal safety exception is applicable. But taking the evidence in the light most favorable to the appellants, the personal safety exception was applicable.

## VI. CONCLUSION

The circuit court erred in granting summary judgment in this case. There was evidence from which a fact-finder could find that appellee's negligence caused Mr. and Mrs. Bogert to fear for their own personal safety. And, even if a fact-finder were to conclude that the sound of the crash did not cause the parents to fear for their own safety, a fact-finder could legitimately find that the parents feared for the safety of their children. Why else would they have run to the girls' room as soon as they were awakened? Lastly, in regard to the claim Mr. Bogert brought as father and next friend of A. A. and A. E., there was evidence, if credited, from which a fact-finder could conclude that A. A. and A. E., as a result of appellee's negligence, had a fear for their own safety.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THE VIEWS EXPRESSED IN THIS OPINION. COSTS TO BE PAID BY APPELLEE.**